J-A10042-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| J.L.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| S.A.T. | |
| Appellee | No. 1866 WDA 2015 |

Appeal from the Order October 26, 2015
In the Court of Common Pleas of Cambria County
Civil Division at No(s): 2008-3924

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PANELLA, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JULY 13, 2016**

Appellant, J.L.B. ("Father"), appeals from the order entered in the Cambria County Court of Common Pleas, which granted primary physical custody of R.E.B. ("Child") to Appellee, S.A.T. ("Mother"), subject to increased periods of partial custody for Father, and granted Mother's petition for relocation.  We affirm.

This Court previously summarized the relevant facts and procedural history of this case as follows:

> Father and [Mother] are the parents of a daughter, R.E.B. ("Child"), born [February 2008].  Father and Mother never married.  Father and Mother briefly resided together in Johnstown after Child's birth.  Mother moved out in August 2008.  Thereafter, Father filed a Complaint for Custody.  After hearings, the trial court granted the parties shared legal custody, primary physical custody to Mother and partial physical custody to Father.  This Court affirmed the

trial court's Order. ***See J.L.B. v. S.A.T.***, 996 A.2d 532 (Pa. Super. 2010) (unpublished memorandum).[1]

> [1] Subsequently, the parties filed Petitions that are not relevant to this appeal. However, we note that Judge Joseph Leahey has recused himself from this case. Further, Father asked President Judge Timothy P. Creany to recuse based upon various accusations. Father's request was denied.

\* \* \*

[Father filed a custody complaint on February 19, 2013. On February 25, 2013, Mother filed a Notice of Proposed Relocation.] Domestic Relations Hearing Officer David Beyer, Esq., ["Mr. Beyer"] was assigned to conduct hearings and prepare a report with recommendations relative to [Mother's] relocation request to move from Cambria County to Blair County to reside with her fiancé and [Child].

Mr. Beyer conducted two days of hearings on May 3, 2013, and July 25, 2013. … [On August 1, 2013, the trial court entered an Interim Order allowing Mother to relocate based upon Mr. Beyer's interim recommendation.]

[On October 2, 2013, Father filed a Praecipe to Cancel the Hearing that was scheduled for October 4, 2013, and schedule the matter for pre-trial conference before a trial judge.] Following the final hearing on October 4, 2013, Mr. Beyer filed the "Report of Hearing Officer" on October 21, 2013, encompassing the custody and relocation issues, recommending that the [trial c]ourt affirm [Mother's] relocation request as a final order, and recommending, *inter alia*, shared legal custody, primary physical custody of [Child] with [] [M]other, and partial [physical] custody of [Child] with [] [F]ather. The parties were advised that exceptions must be filed within twenty (20) days. Neither party filed exceptions within 20 days.

On November 12, 2013, twenty-two (22) days after [Mr. Beyer] filed his Report, [Father], *pro se*, filed a document entitled "Letter re: No Exceptions to the Hearing Officer's Recommendations."

[Father], *pro se*, then filed a "Petition for Emergency Special Relief" on January 2, 2014. The document, paragraphs 3-9, berates witnesses to the domestic proceedings and members of the Cambria County Judiciary and Bar. Paragraphs 10 through 17 challenge [Mr.] Beyer's procedures and scheduling relative to the custody/relocation hearings. Paragraphs 18 through 25 berate the [trial c]ourt.

On January 7, 2014, the [trial c]ourt issued an Order treating [Father's] "Petition for Emergency Special Relief" as a petition for review of [Mr. Beyer's] Report. [A h]earing was scheduled for January 29, 2014, but continued until March 12, 2014, upon request of [Father's counsel.]

On January 28, 2014, [Father] filed a "Praecipe for Entry of an Adverse Order." [Father] cites Pa.R.A.P. 301(e) (Emergency Appeals) as authority for the filing.

\* \* \*

[Father] filed [a] Notice of Appeal…on February 27, 2014, and the case was docketed as a Children's Fast Track appeal on March 10, 2014. At the time the appeal was filed, [Mr. Beyer's] Report and Recommendations had not yet been signed [or] adopted by the [trial c]ourt, and designated as a Final Order.

At the hearing on March 12, 2014, the [trial c]ourt, on the record, indicated that it intended to affirm [Mr. Beyer's] Report and Recommendation. No written Order issued[] because…due to the filing of [the] instant Fast Track Superior Court appeal, [the trial court] lacked jurisdiction to affirm the Report and Recommendations. [The trial court also allowed Father's counsel to withdraw as counsel on March 12, 2014.]

*J.L.B. v. S.A.T.*, No. 395 WDA 2014, unpublished memorandum at 1-3 (Pa.Super. filed October 10, 2014) (alterations in original). On October 10, 2014, this Court remanded the case because the trial court had acted

- 3 -

contrary to the applicable rules and statutes when the court (1) permitted a hearing officer, rather than a trial court judge, to hold hearings on Mother's petition for relocation; and (2) failed to issue a prompt decision. This Court's remand instructions directed the trial court to hold a trial on Mother's petition for relocation and to determine whether the case should be heard by an out-of-county judge due to the procedural irregularities and Father's distrust of the Cambria County Court of Common Pleas judges.

Following remand, a Potter County jurist, Judge John B. Leete, was temporarily assigned on December 4, 2014 to hear the case. Father proceeded *pro se*. In August 2015, Father submitted multiple filings in which he demanded the recusal of Judge Leete and disqualification of Mother's counsel, Attorney Zanoni. Father also requested counsel fees based on the alleged misconduct of the court and Attorney Zanoni. On August 24, 2015, Mother filed an "emergency petition for special relief," alleging Father had refused to return custody of Child to Mother. The court issued an *ex parte* order directing Father to return physical custody of Child to Mother immediately to attend school in the Bellwood School District until further order of court. The trial court subsequently held custody/relocation hearings on August 31, 2015; September 1, 2015; and September 29, 2015. The court denied Father's request for recusal/disqualification on September 1, 2015. The court granted Mother's petition for relocation on October 26, 2015. The court's order also provided that Mother would retain primary

physical custody of Child but increased Father's periods of partial physical custody.[1]  On November 23, 2015, Father filed a timely *pro se* notice of appeal and concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).  Mother filed a motion with this Court to dismiss or quash the appeal on March 10, 2016, alleging Father failed to provide Mother with a designation of the contents of his reproduced record as required by Pa.R.A.P. 2154.[2]  On April 1, 2016, Father filed a motion with this Court to "recuse" Judge Leete and to vacate all orders entered by Judge Leete.

Father raises the following issues on appeal, which we have reordered for ease of disposition:

> DID THE TRIAL COURT DENY [FATHER] AND CHILD THEIR RIGHT TO DUE PROCESS?
>
> DID THE TRIAL COURT FAIL TO ADHERE TO THE ORDER OF THE SUPERIOR COURT (MEMORANDUM 395 WDA 201[4]) AND THE APPLICABLE RULES AND STATUTES REGARDING CUSTODY AND RELOCATION?

---

[1] The order provided, *inter alia*, that Father would have physical custody of Child three weekends per month in alternate months beginning in November 2015, and two weekends per month in all other months.

[2] Father's minor violation of the Rules of Appellate Procedure does not impede our review of this case.  Therefore, we deny Mother's motion to dismiss/quash.  **See Morgan Guar. Trust Co. of New York v. Mowl**, 705 A.2d 923 (Pa.Super. 1998), *appeal denied*, 556 Pa. 693, 727 A.2d 1121 (1998) (denying motion to dismiss based on appellant's failure to designate contents of reproduced record as minor infraction that did not hinder meaningful appellate review).

IS THE TRIAL COURT MANDATED TO RECUSE?

DID THE TRIAL [COURT] ERR BY FAILING TO DISQUALIFY OPPOSING COUNSEL?

DID THE TRIAL COURT ERR BY FAILING TO AWARD [FATHER] LEGAL FEES?

DID THE TRIAL COURT ERR BY FAILING TO GRANT FATHER PRIMARY CUSTODY AS IT IS IN THE BEST INTEREST OF THE CHILD AS SUPPORTED BY THE EVIDENCE?

DID THE TRIAL COURT ERR IN GRANTING MOTHER PERMISSION TO RELOCATE BECAUSE IT WAS NOT IN THE BEST INTEREST OF THE CHILD?

(Father's Brief at 7-8).

In his first five issues combined, Father argues that following remand, the trial court denied his right to due process by failing to schedule trial and issue a prompt decision within the time limits set forth in the applicable rules and statutes. Father contends the delays prejudiced him and were not in the best interests of Child. Father asserts Judge Leete and Attorney Zanoni should be held in contempt. Father maintains Judge Leete is obligated to recuse himself because of his willful failure to decide the matter promptly and his grant of Mother's "emergency" petitions prior to conducting any hearings. Father claims Attorney Zanoni should be disqualified because he violated the Rules of Professional Conduct when he defended the alleged misconduct of the trial court and "belittled" Father for attempting to protect his and Child's rights. Father concludes this Court should mandate the recusal of Judge Leete, disqualify Attorney Zanoni, award Father legal costs

and fees, vacate the trial court's orders, and decide the underlying custody/relocation issues in the first instance. We disagree.

"[A] party to an action has the right to request the recusal of a jurist where that party has a reason to question the impartiality of the court." *Goodheart v. Casey*, 523 Pa. 188, 198, 565 A.2d 757, 762 (1989). "Recusal is required wherever there is substantial doubt as to the jurist's ability to preside impartially." *In Interest of McFall*, 533 Pa. 24, 35, 617 A.2d 707, 713 (1992). "[A] judge's behavior is not required to rise to a level of actual prejudice, but the appearance of impropriety is sufficient." *Id.* at 34, 617 A.2d at 712.

> It is presumed that the judge has the ability to determine whether he will be able to rule impartially and without prejudice, and his assessment is personal, unreviewable, and final. Where a jurist rules that he…can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion. The party requesting recusal bears the burden of producing evidence that establishes bias, prejudice, or unfairness. This evidence must raise a substantial doubt as to the jurist's ability to preside impartially.

*In re Bridgeport Fire Litigation*, 5 A.3d 1250, 1254 (Pa.Super. 2010) (internal citations omitted).

The award of counsel fees and costs in custody matters is governed by statute: "Under this chapter, a court may award reasonable interim or final counsel fees, costs and expenses to a party if the court finds that the conduct of another party was obdurate, vexatious, repetitive or in bad faith." 23 Pa.C.S.A. § 5339. "Our standard of review of an award of counsel fees is

well settled: we will not disturb a trial court's determination absent an abuse of discretion." ***A.L.-S. v. B.S.***, 117 A.3d 352, 361 (Pa.Super. 2015).

Pennsylvania Rule of Criminal Procedure 1915.4 provides as follows:

**Rule 1915.4.  Prompt Disposition of Custody Cases**

**(a)  Initial Contact With the Court.**  Depending upon the procedure in the judicial district, the parties' initial in-person contact with the court (including, but not limited to a conference with a conference officer pursuant to Rule 1915.4-2, a conference with a judge, conciliation, mediation and/or class/seminar) shall be scheduled to occur not later than 45 days from the filing of a complaint or petition.

**(b)  Listing Trials Before the Court.**  Depending upon the procedure in the judicial district, within 180 days of the filing of the complaint either the court shall automatically enter an order scheduling a trial before a judge or a party shall file a praecipe, motion or request for trial, except as otherwise provided in this subdivision.  If it is not the practice of the court to automatically schedule trials and neither party files a praecipe, motion or request for trial within 180 days of filing of the pleading, the court shall, sua sponte or on motion of a party, dismiss the matter unless a party has been granted an extension for good cause shown, **or the court finds that dismissal is not in the best interests of the child**.  The extension shall not exceed 60 days beyond the 180 day limit.  A further reasonable extension may be granted by the court upon agreement of the parties or when the court finds, on the record, compelling circumstances for a further reasonable extension.  If an extension is granted and, thereafter, neither party files a praecipe, motion or request for trial within the time period allowed by the extension, the court shall, sua sponte or on the motion of a party, dismiss the matter unless the court finds that dismissal is not in the best interests of the child. A motion to dismiss, pursuant to this rule, shall be filed and served upon the opposing party.  The opposing party shall have 20 days from the date of service to file an objection.  If no objection is filed, the court shall dismiss the case.  Prior to a sua sponte

dismissal, the court shall notify the parties of an intent to dismiss the case unless an objection is filed within 20 days of the date of the notice.

**(c) Trial.** Trials before a judge shall commence within 90 days of the date the scheduling order is entered. Trials and hearings shall be scheduled to be heard on consecutive days whenever possible but, if not on consecutive days, then the trial or hearing shall be concluded not later than 45 days from commencement.

**(d) Prompt Decisions.** The judge's decision shall be entered and filed within 15 days of the date upon which the trial is concluded unless, within that time, the court extends the date for such decision by order entered of record showing good cause for the extension. In no event shall an extension delay the entry of the court's decision more than 45 days after the conclusion of trial.

**(e) Emergency or Special Relief.** Nothing in this rule shall preclude a party from seeking, nor a court from ordering, emergency or interim special relief at any time after the commencement of the action.

Pa.R.C.P. 1915.4 (emphasis added). *See also* Pa.R.C.P. 1915.17(d) (stating: "The procedure in any relocation case shall be expedited. There shall be no requirement for parenting education or mediation prior to an expedited hearing before a judge").

Instantly, this Court previously remanded this case because of procedural irregularities, including the improper appointment of a hearing officer and the trial court's failure to issue a prompt decision under the applicable rules and statutes. This Court filed its prior decision on October 10, 2014. An out-of-county jurist was assigned to the case on December 4, 2014. The first custody/relocation hearing was held on August 31, 2015. At

- 9 -

that hearing, the court also heard argument on Father's motion for recusal/disqualification, which was largely based on the delay in proceeding to trial after remand. The court made the following statement on the record:

> The [c]ourt was assigned to this matter in December as I recall. However, due to request for re-argument and so on, the file actually wasn't returned to this county until February 19.
>
> In March I was in an accident just outside my home. At the time it seemed that it was a quick fix. To be more specific, just so the record is full and complete, it was a shoulder dislocation after a fall on the ice. The shoulder was replaced properly. Started physical therapy and it seemed that hopefully within a few weeks things would be fine.
>
> Unfortunately, that did not occur and things went downhill and culminated in a major surgery which occurred on July 1 of this year. As to the suggestion of [Father], which I think is a valid suggestion in many regards, as the thing dragged on, yes, I, and with the value of hindsight, having no idea that I would be delayed so long or would have such major surgery as I did, certainly the prudent thing for me to have done would have been to notify the AOPC. It just sort of was sequential and I regret that decision.
>
> That being said, however, the whole focus of [Father's] testimony or statement, there hasn't been testimony, has been delay. I can't make that go away. I regret that this accident caused an inconvenience locally and as I said with the benefit of hindsight and how things developed, yes, I wish it would have been sooner. I have to accept any responsibility for that.
>
> I can assure the parties it wasn't intentional. I wound up a medical mess that was not anticipated and which the orthopedic surgeon [whom] I was dealing with and the physical therapy people I was dealing with thought would resolve itself much differently than it did; however, it

didn't.

That being said, I am here. I am prepared to proceed today and tomorrow on the request for primary custody, on the relocation issue which has been, [Father] is correct, long delayed. I can't fix anything that occurred in this court prior to my appointment. I accept responsibility for what has occurred since my appointment. And I am ready to proceed.

As far as the suggestion that the [c]ourt could have or should have or must report Attorney Zanoni for misconduct, I do not accept that at all. I think that's a complete fallacy at least in terms of my involvement with this case. We'll see where we go from here. I am aware that [Father] has sought continuance even though that would appear to be adding to the prejudice he claims he has already suffered and I'm having trouble understanding that.

Since I have no knowledge of the parties in this case, the attorneys in this case or anything else, the only attorney that the [c]ourt has ever had any contact with who is, to my recollection, is Attorney McGill who I handled the matter some years ago in which he was a counsel and I did designate him as the guardian *ad litem* in [a] separate and somewhat unrelated case. Other than that I have had no involvement with anyone.

The delay is unfortunate. Whatever responsibility has to be accepted for that delay to the extent I've caused it, I must unfortunately accept that responsibility. However, it does not in any manner require that recusal, disqualification that the [c]ourt can see.

(N.T. Hearing, 8/31/15, at 59-61; R.R. at 161a-163a). We accept the court's reasoning. The delay in scheduling a hearing following remand was attributable to truly unforeseen and unfortunate circumstances, *i.e.*, the trial judge's injury and need for medical treatment. Nothing in the record suggests Judge Leete lacked the ability to preside over this matter

impartially. The court was ready to conduct the custody/relocation hearing shortly after Father moved for recusal. Recusal would have lengthened the delay and amplified the prejudice Father claims he incurred. Father failed to produce evidence that any prejudice he suffered was the result of Judge Leete's bias or unfairness as opposed to an unanticipated injury.[3] Further, Father's argument regarding Attorney Zanoni is largely derivative of Father's misplaced allegations of misconduct against the trial court. The record lacks support for Father's assertion that the court was obligated to disqualify Attorney Zanoni from the case. Therefore, the court properly denied Father's recusal/disqualification request.[4] ***See In re Bridgeport Fire***

_____

[3] Moreover, contrary to Father's argument, subsections (a) and (b) of Rule 1915.4 are inapplicable at this stage in the proceedings. Those subsections establish deadlines for pre-trial conferences and trial scheduling relative to the date the complaint was filed. When this Court remanded the case for trial, those deadlines had already long since passed. This Court instead directed the trial court to conduct a custody/relocation trial and issue a prompt decision. The subsequent delay did not implicate Rule 1915.4. Moreover, even if we were to treat the date of this Court's prior decision as the date the "complaint" was filed for purposes of Rule 1915.4, the amended version of the rule in effect at that time gives the court discretion to find that dismissal for violation of Rule 1915.4(b) would not be "in the best interests of the child." ***See*** Pa.R.C.P. 1915.4(b). Here, the court reasonably determined that any further delays would not have been in Child's best interests. To the extent the delay in scheduling trial was contrary to this Court's instruction to issue a prompt disposition, that delay was inadvertent and does not justify recusal of the trial judge or dismissal of Mother's petition for relocation.

[4] The court's order did not specifically rule on Father's request for counsel fees and costs. Nevertheless, the court made clear that no evidence indicated Attorney Zanoni had engaged in obdurate or vexatious conduct. *(Footnote Continued Next Page)*

*Litigation, supra*.

In reviewing a child custody order:

> [O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*S.J.S. v. M.J.S.*, 76 A.3d 541, 547-48 (Pa.Super. 2013) (internal citation

omitted). With respect to a custody order, Section 5328(a) provides:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a

---

*(Footnote Continued)* ─────────────────

Thus, Father is not entitled to counsel fees, costs, or expenses. *See* 23 Pa.C.S.A. § 5339. Additionally, based on our analysis, we deny Father's open recusal motion.

continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3)   The parental duties performed by each party on behalf of the child.

(4)   The need for stability and continuity in the child's education, family life and community life.

(5)   The availability of extended family.

(6)   The child's sibling relationships.

(7)   The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)   The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9)   Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10)  Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11)  The proximity of the residences of the parties.

(12)  Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13)  The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013).

The new Act defines "relocation" as "[a] change in residence of the child which significantly impairs the ability of a non-relocating party to exercise custodial rights." 23 Pa.C.S.A. § 5322(a); *C.M.K. v. K.E.M.*, 45 A.3d 417, 422-25 (Pa.Super. 2012). Section 5337 governs relocation matters and provides in relevant part as follows:

**§ 5337. Relocation**

\* \* \*

**(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h). Moreover,

> [T]he party proposing relocation…bears the burden of proving relocation will serve the children's best interests.

> ***See*** 23 Pa.C.S.A. § 5337(i).  Each party, however, has the burden of establishing "the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation."  23 Pa.C.S.A. 5337(i)(2).

***S.J.S., supra*** at 551.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable John B. Leete, we conclude Father's remaining issues merit no relief.  The trial court opinion comprehensively discusses and properly disposes of those questions. (***See*** Findings of Fact and Conclusions of Law, filed October 26, 2015, at 8-14) (examining each relevant factor under applicable statutes; concluding custody and relocation decisions are in Child's best interest).  The record supports the court's decision.  Therefore, we affirm Father's issues five and six on the basis of the trial court opinion.  Based on the foregoing, Father is not entitled to relief on any of his issues on appeal.  Accordingly, we affirm.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/13/16

- 17 -

J. L. B.
Plaintiff/Movant

:IN THE COURT OF COMMON PLEAS
:OF CAMBRIA COUNTY, PENNSYLVANIA
:

Vs.

:No. 3924 of 2008
:

S. A. T.
Defendant/Respondent

:CIVIL ACTION –LAW IN CUSTODY

---

### INTRODUCTION, FINDINGS OF FACT, CONCLUSIONS OF LAW, DISCUSSION AND ORDER ON MOTHER'S PETITION FOR RELOCATION AND FATHER'S PETITION FOR PRIMARY CUSTODY

### I. INTRODUCTION

Before the court are two inter-related custody matters. The court must rule on mother's proposed relocation from Bedford County to Cambria County, which has de facto occurred over father's objection. Father has also filed primary physical custody of Child. The matters were combined for purposes of hearing following a reversal and remand on the relocation issue from the Superior Court.

### II. FINDINGS OF FACT

1. This matter relates to custodial concerns concerning the partys' minor daughter R. E. B. born February 2008.

2. J. L. B. is a medical doctor and the birth father of Child. He lives in Johnstown, Pennsylvania, Cambria County.

3. S. A. T. now S. G. : is the birth mother, and currently resides in the vicinity of Tyrone, Blair County, Pennsylvania.

4. Mother is currently married to J. G. and has a child with J. G. . In addition J. G. has three children including a son 18, who is a high school senior and resides full time with the family. His other two children are subject to week on /week off custody arrangement amicably worked out with the former Mrs. G.

1

162

5. *Mother & J.G.* married on August 2013, and *their* *child* was born on August 2014.

6. *Father* has three other children as well, and is involved with custody litigation with some of those children

Those children are with *Father* on a partial custody basis, including alternate weekends among other times. The oldest of those children, , is a college student. *A son* is currently 15, while *a daughter* is 12 years old.

7. The parties were never married, but did cohabit until the time that *Child* was about six months old. They resided in the Doctor's home in Westmont, although mother was then employed in Bedford County. After the separation of the parties, mother resided on Clarion Avenue in Bedford, Pennsylvania for approximately five years where she was employed in a nursing home facility. She had maintained employment there for approximately ten years until 2011.

8. *Father* has been employed primarily as an emergency room physician, with irregular working hours at times. He is currently seeking employment as medical director of a state correctional facility after being discharged from Med Express.

9. After leaving her job in the Bedford area, mother worked for Southern Tier Hospice in Altoona. She left that employment after a company reorganization, and went to work for UPMC Altoona which is close to her home.

10. Father lives in a comfortable home in the Westmont section, while mother lives on a five acre property in a spacious home owned by *J.G.*

11. *Father* has been unemployed since March 2015, but is currently seeking employment as noted herein.

12. Prior to moving to the Tyrone area, mother filed a timely notice of relocation, and father filed a timely objection.

13. The parties shared legal custody with mother having primary physical custody, pursuant to an order of the trial court dated July 15, 2009, and later affirmed by the Superior Court at docket 1368 W. D. A. 2009 (Pa. Super. Crt. 2010).

14. Further custody hearings were held, with the final hearing on August 12, 2011, which reduced father's periods of partial custody. Father appealed again and the matter was affirmed

2

by the Superior Court on April 3, 2012, at 940 WDA 2011, as father's notice of appeal was untimely.

15. The parties, primarily ¡Father¡, initiated custody litigation shortly after Child was born in 2008, and that litigation has continued to date.

16. After the notice of relocation was filed, various hearings were conducted by the hearing officer who then made a report to the court which issued an order. The father appealed this matter to the Superior Court on a pro-se basis, and on October 10, 2014, Superior Court reversed and remanded the proceeding largely on the basis procedural irregularities concerning the use of a master. 395 WDA 2014, (Superior Court October 10, 2014).

17. After efforts were made for reargument in the Superior Court, that was denied and the record was returned back to Cambria County on February 19, 2015. Shortly thereafter, the undersigned senior judge suffered an injury which did not respond to treatment and resulted in delay of the matter on remand. This Court accepts full responsibility for any such delays.

18. Full hearings were held on both the relocation and father's pending petition or primary physical custody on August 31, 2015, September 1, 2015, and September 29, 2015.

19. The parties have a strained relationship at best, and do not trust each other.

20. While the parties on occasion have been able to be flexible with each other, this has been done on a reluctant and occasional basis.

21. The parties communicate primarily by text message.

23. On March 12, 2014, the trial court indicated that it would affirm the Master's report, but did not issue an order. Father's most recent counsel withdrew later.

24. In response to Judge Creany's interim order of August 5, 2013, mother proceeded with marriage to J. G. and relocated to the Tyrone area. She enrolled the child in the Mother's School system for kindergarten. The child has continued within that school and is now in second grade, all over father's objections.

25. Mother gives her reasons for relocation as related to her marriage, being close to her work, and being able to spend more time with her child. Her assertion that the Bellwood School system is in some manner superior to the Bedford School is based solely on internet research. The Court does not accept that proposition in view of the lack of supporting evidence.

3

26. Child loves her home and the farm animals there, as well as her step-brothers and appears to have a good relationship with her step-father.

27. Child has a close and loving relationship with both her mother and her father.

29. With the information provided it appears that Child also has an excellent relationship with her half siblings on father's side and J. G. 's children and her new sister

30. While the parents have an acrimonious relationship, they are both loving and capable parents. Neither presents any threat of harm to Child.

31. In terms of residence, Child transitioned directly from her mother's rental home in the Bedford area to the Tyrone area home when her mother married.

32. The exchange point for custody has historically been Stoystown Pennsylvania, in Summerset County near where some of father's family resides.

33. Mother has proposed the exchange point now be in Ebensburg, which would result in similar driving time for the parties. Father would have no greater travel time than he would with the Stoystown exchange point.

34. The current partial custody schedule for father is designed to maximize his time with Child and his other children.

35. When mother lived in the Bedford area, she did so to be close to her family and job.

36. When mother originally relocated from father's Westmont home, she left him what is referred to as a "Dear John" letter, and did not give him advance notice.

37. For some years the child attended a daycare program in the Bedford area which she enjoyed, although when she was very young she attended daycare at the Learning Lamp program in the Johnstown area.

38. Mother and her present husband started dating in 2011 and did not live together on a full time basis until marriage.

39. While mother has been responsible for much of the child's health and day-to-day care, her father has been involved as his employment permitted. He has maintained contact with the child's school in the Bellwood district.

4

40.   Mother's husband J. G. does construction work, and is generally home at night and rarely works weekends.

41.   Child is currently involved in dance and gymnastics programs as well as cheerleading at her current school. Father has objected to some of these activities as he feels the relocation matter should be solved first.

42.   While the child seems to be doing well in her current school and location, the court cannot base its decision on that, as this remand was to determine the initial relocation, as opposed to the defacto results of relocation.

43.   Due to poor communications between the parties, J. G. was providing health insurance at the same time her father was paying for expensive cobra coverage.

44.   The parties have quarreled over which doctors and other health care providers should be available for Child.

45.   Child has substantial dental work done by a dentist, following significant decay issues resulting from what is commonly known as "bottle mouth." Specifically, mother allowed the child to drink Gator Aid and other sugary drinks. Father disputes that he in any manner agreed with this, although his older children were involved in sports and used Gator Aid and related products.

46.   Shortly before the present hearings started, father refused to return the child so she could start school in Bellwood and instead urged mother to let him home school her pending resolution of the present issues.

47.   This Court issued an ex-parte order returning the child to the Bellwood School District before the start of the present school year.

48.   While mother has expressed fear of father, father points out that there has been no documented physical abuse or any suggestion of the same.

49.   Mother is concerned that Child's time with her father is not productive, in view of what she refers to as father's obsession with the present litigation. The Court notes that the parties, primarily father, have litigated custody since shortly after Child was born and they separated.

50.   While both parties claim to keep the other one informed of all the developments, there appears that there are gaps.

5

51. As to alleged child neglect, the court finds mother was lax in permitting excessive use of sugary drinks, but notes that father failed to take any action as well. He saw Child regularly during the applicable period of time.

52. Mother smokes on occasion, but not in the presence of the child. Father does not smoke, and puts strong emphasis on nutrition and healthy practices for his daughter.

53. At times in the past, father had ten overnights with the child, later reduced to eight. Mother later wanted and received a more structured situation.

54. More squabbles between the parties emerged this past summer over vacation times, when father apparently failed to give the requisite thirty day notice, and mother allegedly had made other plans.

55. Currently, step-father Jason takes Child to school. She returns to either home or daycare by bus depending on the day of the week.

56. Father has apparently discussed custody matters in front of Child and his other children, and in such conversations has threatened mother's attorney and various judges.

57. Child generally does well in school, but she has some problems with math and attends a special "math club."

58. Due to the acrimony between the parties, mother on occasion has invited the paternal grandfather of the child, but not the father, to birthday parties and other special occasions.

59. Father's concerns that mother has tried to change the child's last name to "Princess" are misguided, as it appears to be more of a term of endearment.

60. The child on occasion refers to J. G. as "dad," and he introduces her as his daughter.

61. J. G. impressed the court as a reasonable and caring individual with a positive relationship with his own ex-wife resulting in few concerns over the custody of their children. He has a positive relationship with Child.

62. Child also refers to J. G. on occasion as "J" or "J-dad." Child is close to her step-brothers as well.

6

63.     Father t has a positive, loving and supportive relationship with all of his children. He also makes certain of a healthy diet and regular church attendance when Child is with him.

64.     L. A. G.     testified in this matter. She is a well-known counselor, mediator and crisis coordinator who in the past was a court resource for this troubled family. In her present role however, she basically consults for Father, and the court must consider her position in this case as advocacy as opposed to neutrality. The court notes she has had no direct contact or interaction with Child since November 2010, other than occasional chance public contact. She did indicate that Father was obsessed with aspects of this litigation as he feels his rights are violated and holds the court and mother's counsel responsible for that. She notes that he may seem explosive at times but in fact is not.

65.     Father would like to have primary custody of Child. If so, he would enroll her in the Westmont school system, and also utilize a respected daycare and child learning center known as the Learning Lamp.

66.     Father also has an acrimonious relationship with D. B., the mother of this other three children. Various custody matters are pending.

67.     The parties have squabbled over holiday visits including Memorial Day visits. Memorial Day is a significant family holiday for father's family, while mother's family has a large Christmas gathering in December before the holidays.

68.     All the doctor's other children are involved in a variety of extra-curricular activities and sports, and all have been successful in school including one in college.

69.     While on vacations, Child has a wonderful time with both of her parents when things are not focused on custody concerns. She is active with each of them, and has various activities with each that she enjoys very much.

70.     The child did not appear in these proceedings, and thus the court has no information of the child's reactions to the seemingly endless litigation.

71.     Child needs some help with issues of attentiveness in school and following directions.

72.     Father's proposed employment at the state correctional institute should give him considerable flexibility and a much more regular schedule.

73.     Father graduated medical school in 1991 and he was a medical resident until 1994. He left Conemaugh Hospital at the end of 2009, and then worked at home until September 2011

7

when he started for Med Express. In the meantime, father had some surgery and periods of medical disability.

74. Mother has generally kept father advised of events concerning *Child* and on occasion has offered him extra time. Many times this has not worked out due to the poor relationship between the parties.

75. While father has been accused of suffering from intermittent explosive disorder, he apparently never been formerly diagnosed with such a condition.

## III. CONCLUSIONS OF LAW

1. The best interest of the child will be served by permitting mother to relocate to Blair County. Father's time with the child including travel time will not be affected.

2. The child's best interest mandate that father's petition for primary physical custody be denied, although father's time with his daughter should be increased.

## IV. DISCUSSION

The court is required to consider the statutory factors involving relocation as well as any other relevant information. Under the statutory factors, the court must (1) examine the nature, quality, and extent of the involvement and the child's relationship with the party proposing to relocate as well as with the non-relocating party and other significant persons in the child's life. Here, mother has had primary custody since litigation began some years ago. *Child* has had a close and loving relationship with her mother, but also with her father. Whether mother and father's relationship with *Child* has suffered from the seemingly endless custody litigation is a question which was not answered in the course of a three day hearing. Suffice it to say that mother has been very active with the child, as has father during his periods of partial custody. The testimony indicates that *Child* has positive relations with her mother, step-father, birth father, and all of her half siblings.

8

Turning to the second factor, Child is now over seven years old. She appears from the testimony to be a happy and loving child. The court believes that either of her parents could meet her day-to-day needs, and that the relocation will not materially affect her physical, educational, and emotional development. In terms of special needs, it appears that Child has some issues with mathematics, and may have a need for some tutoring and or assistance which is currently being provided. While not relevant to this decision, Child seems to love her current school, which she entered as a kindergarten student. She is now in second grade in the Bellwood School District. She is active in dance, cheerleading and other activities. The move to Bellwood area occurred after the Cambria County Court initially gave preliminary approval to the relocation, prior to the reversal by the Superior Court noted above. The Court finds that the relocation will have no substantial impact on her physical, educational, or emotional development.

Factor three deals with the feasibility of preserving the relationship between the non-relocating party and the child. In that regard, the relocation would change little. Father's driving time would be almost the same if the exchange point were the Edenburg, Cambria County area. No other changes to father's current time schedule with the child would occur. It appears that both parties have the logistical and financial ability to deal with the exchanges. Father's exchanges would be a different point, but nothing would really change for father.

In terms of the child's preference, the child did not testify and thus did not express any preference. Based on all of the testimony, however, the court finds that Child has a close and loving relationship with her father, mother, and step-father, as well as all of her half-siblings.

Considering the fifth factor, there is considerable testimony about which parent interfered with the custodial rights of the other. During the long history of litigation in this case, it appears

9

that mother and father have each been unreasonable with the other on occasion, although sometimes they can and do communicate by text. It appears that mother has become reluctant and impatient with father in view of father's continual litigation efforts with this child. Father on the other hand has on occasion been inflexible with mother. Mother was also found to be in contempt one time in the past. Father complains that mother has attempted to change the child's name. The court finds this to be an issue taken totally out of context, and that the child has been referred to by her mother and step-father as " ___ ' Princess" without any intent to have her last name become "princess." Father shared his concern that Child refers to her step-father, . J. G. as father on occasion along with other designations including "daddy ___ ." The court finds none of these differences of opinion to be substantive in any way. There are legitimate concerns that if litigation continues on a long term basis, it will be very detrimental to future relationships between the parties as well as their perceptions and characterizations of each other. Mother has expressed a desire to have father spend less time with Child and would essentially like Child all to herself. This is of course unrealistic, and may well result from mothers reaction to father's ongoing litigation. Clearly Child needs the love and support, and contact with both of her parents. Despite the bitterness caused by this long custody litigation, the parties must do their best to be civil to each other and work together for Child's best interests. While there is not pattern of thwarting the relationship of the child with either parent, mother must recognize that father is a vital part of Child's life and react accordingly.

The court in factor six is required to consider whether the relocation will enhance the general quality of mother's life, as she is the one seeking relocation. There clearly are some benefits to mother, in that she can live with her husband, in her husband's home and on a spacious property. The Bellwood home owed by J. G. is also close to mother's

10

employment at UPMC. While there were some discussions as to the quality of Bellwood school versus the school in father's neighborhood, nothing was presented to the court that would indicate that either school district was in any manner deficient.

As to the whether the relocation will enhance the quality of life for the child, that appears to be a somewhat open question. She seems to enjoy life on the farmette owned by K.J. G. as well as the contact with her infant sibling. This however, is not to say that she does not enjoy her time with her father, although mother has questioned whether father's obsession of the present litigation interfered with him spending quality time with the child.

In summary the court cannot say with certainty that whether or not the relocation will enhance the quality of the child's life, but does find that it will not harm the quality of the child's life in any way.

The court is also required in factor seven to determine the reasons and motivations of each party seeking and opposing relocation. After a careful review of three days of testimony, the court finds no improper motive on mother seeking relocation, nor in father for opposing relocation. Although father also wants primary custody, there will be no substantial change in the time allocated to father to spend with his daughter brought about by the relocation.

Factor eight looks to the past and present abuse committed by one of the parties. Father accuses mother of allowing significant tooth decay, which has since been dealt with by a dentist. The problem resulted from excessive sugary drinks, largely furnished by mother. While the decay situation may evidence some level of neglect on the part of both parents, mother for furnishing the drinks and father for not picking up on any problems, that situation does not rise to the level of abuse relative to either party. The mother alleges some fear of father, there is no history of physical abuse, although there have been strong verbal disagreements from time to

11

time. There is no evidence that thus far, the child has been harmed by any of this. Even though the potential for emotional abuse is there if the parties continue on their present path, none has been demonstrated to date.

While father has not been diagnosed with explosive personality disorder, he has approached litigation in such a manner that mother may be very frustrated by the sheer volume and length of litigation. Of concern to the court are the comments of L.A.G. on the topic as she discussed father's perception of unfairness in the litigation process. Father feels he has been treated unfairly, and he becomes very frustrated and upset. Obviously, if he prevails one could assume that he will be satisfied. What will be his reaction if he doesn't prevail? Based on L.A. G.'s comments, it appears possible that he may respond with substantial anger. The court is also dismayed that father has allegedly made threats concerning Cambria County judges and attorney Zanoni. There is no place in this litigation for such conduct, and this reflects poorly on father.

Father argues strongly that the court cannot consider the results of the relocation accomplished under Judge Creany's order, since that order was reversed by the Superior Court. Thus, the court is attempting to place itself in the position that it would be were the relocation still being debated, before the geographic move actually took place.

Since father is seeking a change in primary custody the court must consider some additional factors. Many applicable factors have been generally or specifically discussed in the context of relocation. In addition, the court must determine which parent has performed parental duties on behalf of the child. Given father's work history, and his unavoidable erratic scheduling at the various jobs, mother has performed historically the majority of the parental duties for

12

Riley. It is not to say that father has not contributed nor that he lacks knowledge on how to perform parental duties.

As to stability and continuity in the child's education, family, and community life, both parents are capable of providing this. Father's work history involved several different changes, and until very recently, he was unemployed for a number of months. The potential employment situation that was discussed at the most recent hearings would give him some better professional stability, and a more regular schedule for dealing with his child.

Extended family is available, with mother having considerable family in Bedford County and father having family in the Altoona area. There are no large distances involved, such as would prohibit the child from having interaction with extended family.

As to the child's sibling relationships, the testimony indicated the child has close and loving relationships with her half-siblings through her father, and as well as her half sibling through her mother and  J. G. , as well as with  J. G. 's children.

Turning to the proximity of the residencies, the exchange point and driving time would almost the same, with the spot for exchanges being changed to Ebensburg, Pennsylvania. The relocation discussed above would not substantially modify the distance between the party's residences.

Each party has suitable arrangements available for child care, as father emphasizing the Learning Lamp facility in his area, and mother utilizing friends and other facilities in her area. Neither party appears to have any substantial history of drug or alcohol abuse. Mother has taken psychiatric drugs in her past but has not done so in recent times, nor currently. The court has no concerns over either parent having a substance abuse issue.

13

The court is also required to consider the mental and physical conditions of each of the parties and others in the households. It appears that both the parties are all in good physical health. Father, however, seems to suffer great stress and upset over the current custody arrangements. He is bitterly unhappy with Cambria County Court and some of its judges as well as *Mother*'s current counsel. His response to this upset borders on obsession at times, although father is certainly free to seek and protect his rights just as he has done. Thus, the question comes up as whether father is spending his time with the child, working on his litigation, or with direct involvement with the child. The court reaches no conclusion on this debated point at this time.

Considering custody factor nine, both parties are capable of maintaining loving, stable and consistent nurturing relationships needed by this child. Both parents appear to be thoroughly capable. The child's emotional needs appear to be met by both parents but may well be compromised over time if the present course of antagonistic litigation continues.

Considering all of the evidence as well as the statutory factors, the court believes that the limited relocation sought by mother is appropriate, and also that mother should continue to retain primary custody. The courts findings on father, however, indicate that he could and should have more time with his daughter, especially if he can use that time wisely, as he often has in the past. Father seems committed to engaging in a variety of activities with his daughter, including but not limited to some travel and keeping her active in her church. While mother will undoubtedly be upset with father spending more time with *Child*, the court finds that it is in the child's best interest to do so. Father must understand that his focus must be the child, more so then his personal involvement in all of the litigation, even though some of it has been successful. The key to this child's happiness, success, and best interest lies in the hands of the parents. If they

14

can learn to cooperate, and gain some level of trust between them, *Child* will clearly benefit. If Riley continues, however, to be raised in the acrimonious shadow of a courthouse, her prospects are not nearly as bright. The court finds no substantial issues with either parent, and thus, there is no reason why they cannot and should not work together, assuming they are willing.

Father will be given additional weekend, holiday and summer time with *Child* which will be beneficial for *Child* if the parties can reduce the level of conflict. An appropriate order follows:

15

J. L. B.

Plaintiff/Movant

Vs.

S. A. T.

Defendant/Respondent

:IN THE COURT OF COMMON PLEAS
:OF CAMBRIA COUNTY, PENNSYLVANIA
:
:No. 3924 of 2008
:
:CIVIL ACTION –LAW IN CUSTODY

## ORDER

AND NOW, October 22, 2015, Mother's motion for relocation to the Tyrone Bellwood area is granted, and father's objections are dismissed. Father's petition for primary custody is denied, subject, however, to increased periods of partial custody with the daughter of the parties R. E. B., as provided herein.

1.      The parties will continue to share legal custody as provided in the orders of July 15, 2009, and May 10, 2011.

2.      Mother will have primary physical custody, subject, however, to partial custody in favor of father as follows:

      a.      In alternate months effective November 2015, three weekends per month from Friday at 6:00 p.m. through Sunday at 4:00 p.m.

      b.      In other months, effective December, 2015, two weekends per month from Friday at 6:00 p.m. through Sunday at 4:00 p.m.

      c.      Two of the weekends every month will be at the same time as when father's other children are in his partial custody.

16

d.      For holidays father will have the child for a minimum of 72 hours over the Christmas school holiday in addition to his regular weekend visits together with a minimum of 6 hours Christmas Day or 8 hours Christmas Eve.

e.      For Thanksgiving, New Year's, Easter, July 4, and Labor Day, the parties will equally divide the holiday, including any Mondays which are also school holidays.

f.      For summer, the parties will rotate custody on a two week basis, with mother, however, to have the first three days after school is out and the last week before school starts, in any event.

g.      Father's Day will always be with father and Mother's Day with mother, taking precedence over any other custody schedule provisions.

h.      Father will have every Memorial Day weekend and Mother every weekend of her family Christmas party, taking precedence over any other custody scheduled provisions.

3.      Neither parent shall be under the influence of drugs or alcohol while serving as physical custodian of the minor child.

4.      Each party will have liberal telephone contact on a daily basis with the child at reasonable hours, not to exceed however, two calls per day. These calls are to be private.

5.      Neither parent or any extended family members or significant others in either parents life shall make derogatory or threatening comments about the other parent or their extended family in the presence of or the hearing of the child, or otherwise, nor allow anyone from either family or household do the same.

6.      Each party shall hold the other party out as worthy of the child's love and respect and take all reasonable steps to facilitate the other parents periods of custody.

17

7.    The parties will communicate as necessary with each other on all matters concerning the health, education and welfare of the child. The parties, however, shall not communicate through the child, especially as to matters concerning custody.

8.    The parties will promptly and without exception share with each other all information concerning the child including but not limited to school, church, sports, and activity schedules together with all health, welfare and educational matters. The parties are welcome to attend all events and appointments if they are of good behavior and not upsetting to the child.

BY THE COURT:

John B. Leete, Senior Judge
Specially Presiding.

18